1  Dan Do, CSBN 157678
   EFFICIO LAW GROUP, PC
2  111 West Saint John Street, Suite 420
   San Jose, CA 95113
3  (408) 292-5505
   Fax (408) 416-0931
4
   Attorney for HUNG NGUYEN & N&H INVESTMENTS
5

ENDORSED

FILED

NOV 14 2011

DAVID H. YAMASAKI
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara    DEPUTY

R. Schwartz

6
7            SUPERIOR COURT OF CALIFORNIA
             COUNTY OF SANTA CLARA
8            UNLIMITED JURISDICTION
9

| | |
|---|---|
| 10  MIMI NGUYEN, JOHN NGUYEN, LOC PHAN, BICH TONG, individually, | Case No. 109-CV-155976 |
| 11  Plaintiffs, | CROSS-COMPLAINT BY N&H INVESTMENTS LLC |
| 12  vs. | |
| 13  HUNG NGUYEN, an individual; N & H INVESTMENTS, LLC, and DOES 1 – 10, | |
| 14  Defendants. | |
| 15 | |
| 16  GREEN VALLEY CORPORATION, | |
| 17  Cross-complainant, | |
| 18  vs. | |
| 19  HUNG NGUYEN, an individual, N&H INVESTMENTS, LLC, a California limited liability company, and IMPERIAL INVESTMENTS AND DEVELOPMENT, LLC, a California liability company, | |
| 20 | |
| 21 | |
| 22  Cross-defendants. | |
| 23  N&H INVESTMENTS, LLC, | |
| 24  Cross-complainant/Third-party Plaintiff | |
| 25  vs. | |
| 26  GREEN VALLEY CORPORATION, IMPERIAL INVESTMENTS AND DEVELOPMENT, LLC, and ROES 1 through 50, inclusive, | |
| 27 | |
| 28  Cross-defendants/Third-party Defendants | |

1

Case: 15-05052   Doc# 9-6   Filed: 05/27/15   Entered: 05/27/15 11:25:06   Page 1 of 22
of 29

Cross-complainant/Third-party Plaintiff N&H INVESTMENTS, LLC (hereinafter "N&H"), for its cross-complaint against Cross-defendants/Third-party Defendants GREEN VALLEY CORPORATION (hereinafter "GREEN VALLEY") and IMPERIAL INVESTMENTS AND DEVELOPMENT, LLC (hereinafter "IMPERIAL"), alleges as follows:

<u>PARTIES</u>

1.     N&H is a limited liability company, established under the laws of the state of California in June 2005.

2.     GREEN VALLEY is, and at all times to this action was, a corporation doing business as Barry Swenson Builder and established under the laws of the State of California. GREEN VALLEY has extensive experience in real estate development and/or construction projects.

3.     IMPERIAL is, and at all times relevant to this action was, a limited liability company established under the laws of the state of California.

4.     N&H does not know the true names of defendants ROES 1 through 50, inclusive, and therefore sues them by those fictitious names.

<u>GENERAL ALLEGATIONS</u>

5.     N&H is informed and believes, and thereupon alleges, that on or about August 30, 2005, GREEN VALLEY purchased from Caldo Oil Company Inc. (hereinafter "CALDO") two contiguous parcels of real property located at 2266-2276 Senter Road, San Jose, California, APN #477-73-042 and APN #477-73-041 (hereinafter the "Property"). The Property was the site of a commercial development project known as Senter & Quinn Retail (hereinafter the "Project").

6.     N&H is informed and believes, and thereupon alleges, that during the negotiation process, GREEN VALLEY engaged AEI Consultants of 2500 Camino Diablo Suite 200, Walnut Creek, CA 94597 (hereinafter "AEI") to conduct a Phase I Environmental Site Assessment of the Property. On or about November 19, 2004, AEI issued a report indicating that there was residual contamination in soil and groundwater on the Property and warned GREEN VALLEY that additional mitigation may be required upon redevelopment.

2

Case: 15-05052   Doc# 9-6 Filed: 05/21/15   Entered: 05/21/15 15:06:24   Page 2 of 29

7.    On or about March 23, 2005, the County of Santa Clara issued a closure evaluation letter (the "Santa Clara County Closure Letter") to CALDO stating , in part, the following:

> "Residual contamination both in soil and groundwater remains at the site that could pose an unacceptable risk under certain site development activities such as site grading, excavation, or the installation of water wells. The County and the appropriate planning and building department shall be notified prior to any changes in land use, grading activities, excavation, and installation of water wells. This notification shall include a statement that residual contamination exists on the property and list all mitigation actions, if any, necessary to ensure compliance with this site management requirement. The levels of residual contamination and any associated site risk are expected to reduce with time."

A copy of the Santa Clara County Closure Letter is hereto attached as <u>Exhibit A</u> and incorporated herein by reference.

8.    N&H is informed and believes, and thereupon alleges, that GREEN VALLEY received a copy of the Santa Clara County Closure Letter from CALDO, or that GREEN VALLEY was fully aware of the content of said document.

9.    In spite of the findings issued by AEI and the County of Santa Clara, GREEN VALLEY finalized the purchase of the Property to begin developing the Project.

10.    Prior to the date that GREEN VALLEY finalized the purchase of the Property, and after the date that AEI issued its Phase 1 Environmental Site Assessment report and the date the County of Santa Clara issued its closure letter, on or about April 5, 2005, GREEN VALLEY entered into a contract titled Real Property Purchase and Sale Agreement And Joint Escrow Instructions (the "Contract") to sell the Property and the Project to IMPERIAL. A copy of the Contract is hereto attached as <u>Exhibit B</u> and incorporated herein by reference.

11.    The essential terms of the Contract are as follows:

a.    GREEN VALLEY was to construct the a new retail building shell (hereinafter the "Building") on the Property, consisting of 20-28 units totaling approximately 33,803 gross square feet, plus on site improvements (hereinafter the "Improvements") consisting of landscaping, walkways, paving and the like pursuant to preliminary plans and specifications.

Case: 15-05052   Doc# 9-16 Filed: 05/27/15   Entered: 05/27/15 15:06:24   Page 3 of 29

b. The purchase price for the Property and the Improvements was to be $13,521,200.

c. IMPERIAL was to pay to GREEN VALLEY the sum of $845,075 for Tenant Improvement Allowance.

d. IMPERIAL was to share with GREEN VALLEY 50% of the costs for the development of the Project even if GREEN VALLEY was unable to obtain the necessary development entitlements.

e. GREEN VALLEY would convey title to the Property to IMPERIAL by grant deed at close of escrow, which would occur after GREEN VALLEY had completed the Improvements and received the Final Inspection from the City of San Jose. Closing date was estimated

f. The Contract includes multiple warranties and representations, among them a warranty that the Property contains no hazardous materials. Such warranty is as follows:

> "9.6 No Hazardous Materials. To the best of Seller's actual knowledge, other than as may be disclosed or referenced in existing lease documents and any environmental reports previously generated and delivered to Seller and in Seller's actual possession (each of which such documents (if any) have been previously delivered to and reviewed by Buyer), there is no contamination from or by any hazardous waste or toxic substance in, on or about the Property, or on or below the surface of the Property, including, without limitation, contamination of soil, subsoil or ground water, that constitutes a violation of any law, rule or regulation of any government entity having jurisdiction over the Property, or that would expose Buyer to liability to any third parties. Buyer expressly acknowledges the existence of gas station operations conducted on portions of the Property under written lease agreements."

(In the Contract, Seller refers to GREEN VALLEY and BUYER refers to IMPERIAL).

12. GREEN VALLEY did not take any action to cure or mitigate the contamination found on the Property when entering into the Contract with IMPERIAL.

13. On or about July 12, 2005, N&H and IMPERIAL executed an agreement (the "Assignment") whereby Imperial assigned its rights under the Contract to N&H and N&H assumed the obligations under the Contract from Imperial. A copy of the Assignment is hereto attached as Exhibit C and incorporated herein by reference.

4

Case: 15-05053   Doc# 9-6   Filed: 05/27/15   Entered: 05/27/15 15:06:24   Page 4 of 29

14. On or about September 8, 2008, Green Valley and Imperial amended the Contract under the caption "FIRST AMENDMENT TO REAL PROPERTY PURCHASE AND SALE AGREEMENT" (the "Amendment"). A copy of the Amendment is hereto attached as Exhibit D and incorporated herein by reference.

15. The essential terms of the Amendment are as follows:

   a. IMPERIAL and its affiliates assign all interest and rights related to the Property and Project, including rights and interest in purchase contracts entered into with third-party buyers of individual commercial condominium units to be built on the Property. IMPERIAL also releases GREEN VALLEY from any further obligations under the Contract.

   b. GREEN VALLEY acknowledges receipt from IMPERIAL deposits totaling $2,050,000.00, consisting of deposits from third-party buyers of individual commercial condominium units within the Project in the amount of $1,019,115.10, and deposits made by IMPERIAL from its own resources in the amount of $1,030,884.90.

   c. As to the deposits made to GREEN VALLEY by IMPERIAL on behalf of third party buyers, GRREN VALLEY shall return to any third party buyer who fails to close escrow or complete the purchase, the deposit made by said third-party buyer to IMPERIAL, subject to the terms of the agreement between said buyer and IMPERIAL.

16. As IMPERIAL's assignee under the Contract, N&H also executed the Amendment. The Amendment's terms that apply to IMPERIAL also apply to N&H.

17. Prior to the execution of the Amendment, the Plaintiffs in the case in chief, namely MIMI NGUYEN, JOHN NGUYEN, LOC PHAN, and BICH NGUYEN ("Third-party Buyer Plaintiffs") requested that their purchase contracts with N&H (as an assignee of the Project) be cancelled. N&H earmarked the deposit amount made by said Third-party Buyer Plaintiffs in the escrow account to be refunded to them.

18. N&H has demanded the escrow officers to release the Third-party Buyer Plaintiffs' deposit to N&H so that N&H can make the refund to them. GREEN VALLEY has prevented N&H from releasing the Third-party Buyer Plaintiffs' deposit by instructing the escrow officers not to cooperate with N&H.

Case: 15-15053   Doc#: 9-6 Filed: 05/27/15 Entered: 05/27/15 15:06:24   Page 5 of 28
of 29

19. On August 9, 2011, GREEN VALLEY, through its counsels at the Paladin Law Group LLP, issued a demand to IMPERIAL and N&H to indemnify GREEN VALLEY in the Third-party Buyer Plaintiffs' complaint against GREEN VALLEY in this action and with regard to the cross-complaint by CALDO against GREEN VALLEY in the US District Court of Northern California, San Jose Division, Case No. 09-CV-04028 LHK (the "Caldo case"). It is upon review of the papers submitted by the parties in the Caldo case that N&H learned about the Phase I Environmental Site Assessment report by ABI and the Closure letter issued by the County of Santa Clara. Generally speaking, upon review of the papers submitted by the parties in the Caldo case that N&H knew that the Property was contaminated and that GREEN VALLEY concealed such fact from N&H.

20. After executing the Assignment, N&H proceeded to enter into agreements with third-party buyers to sell individual commercial condominium units to be built in accordance with the Project. The contamination condition found on the Property prevented most, if not all, of these buyers from securing loan agreements with financial institutions to finance their purchases.

21. Because the third-party buyers cannot finance their purchases due to the contaminated condition of the Property, N&H was forced to negotiate and enter the Amendment described in paragraphs 14-15 of this cross-complaint.

FIRST CAUSE OF ACTION

INTENTIONAL MISREPRESENTATION/CONCEALMENT

(Against GREEN VALLEY)

22. N&H incorporates by reference paragraphs 1-21, inclusive, of this cross-complaint as if fully set forth.

23. Before entering into the Contract with IMPERIAL, GREEN VALLEY knew that there was residual contamination both in soil and groundwater within the Property, as indicated on the Phase I Environmental Site Assessment report prepared by ABI at the request of GREEN VALLEY and on the closure letter dated March 23, 2005 issued by the County of Santa Clara.

24. GREEN VALLEY intentionally misrepresented to IMPERIAL and its assignees, including N&H, that there was no contamination within the Property. GREEN VALLEY expressly guaranteed to IMPERIAL and its assignees that there was no hazardous waste or toxic material on the Property, knowing that such representation was false.

25. At the time these representations were made, N&H was unaware of their falsity, but believed them to be true. N&H relied on these representations to enter into the Assignment agreement with IMPERIAL. Had N&H been aware of the true facts, N&H would not have agreed to enter into said agreement.

26. As a direct and proximate result of GREEN VALLEY's intentional misrepresentations described above, N&H have suffered damages in an amount to be determined by proof at trial. Such damages include, but are not limited to, deposits made by N&H to IMPERIAL, which were then transferred to GREEN VALLEY, in the amount of $1,030,884.90.

## SECOND CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

#### (Against GREEN VALLEY)

27. N&H incorporates by reference paragraphs 1-26, inclusive, as if fully set forth.

28. When GREEN VALLEY made the representations indicating that the Property was not contaminated, GREEN VALLEY had no reasonable ground for believing that the representations were true and made the representations with the intent to induce IMPERIAL and other prospective purchasers, including IMPERIAL's assignees, to purchase the Property and the Project from GREEN VALLEY.

29. GREEN VALLEY had the duty to disclose the contaminated condition of the Property to IMPERIAL and prospective purchasers of the Property and the Project, but failed to do so. Instead, GREEN VALLEY misrepresented to IMPERIAL and prospective purchasers, including IMPERIAL's assignees, of the contaminated condition of the Property and Project by issuing an express warranty that there was no hazardous waste or toxic material on the Property.

30. As the result of the negligent misrepresentations described above, N&H has been damaged in an amount to be determined by proof at trial. Such damages include, but are not

7

1  limited to, deposits made by N&H to IMPERIAL, which were then transferred to GREEN

2  VALLEY, in the amount of $1,030,884.90.

### THIRD CAUSE OF ACTION

### RESCISSION OF CONTRACTS

#### (Against IMPERIAL and GREEN VALLEY)

6   31.   N&H reaffirms and re-alleges the above paragraphs as set forth more fully herein

7  below.

8   32.   Section 1689 of the California Civil Code provides in part as follows:

9   . . .

10   (b)   A party to a contract may rescind the contract in the following cases:

12   (1)   If the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party.

14   . . .

15   (6)   If the public interest will be prejudiced by permitting the contract to stand.

17   . . .

18   33.   The Contract, and the Amendment described above were contracts obtained

19  through fraud (the above described intentional misrepresentation).  The Assignment obtained by

20  N&H from IMPERIAL was the result of GREEN VALLEY's fraud and/or a mutual mistake

21  made by IMPERIAL and N&H with regard to the presence of contamination on the Property.

22  N&H would not have entered into the Assignment to assume the obligations under the Contract

23  but for such misrepresentation and mistake.

24   34.   To require N&H to continue to perform the obligations under the Amendment is

25  adverse to the public interest as such requirement will encourage fraudulent conduct.

26   35.   The Contract, Assignment, and Amendment should be rescinded under Section

27  1689.  Said agreements should be considered null and void.

28

Case: 15-05052   Doc# 9-6   Filed: 05/27/15   Entered: 05/27/15 11:25:06   Page 8 of 29

36. N&H offer to restore to IMPERIAL and GREEN VALLEY the consideration given by them for the acquisition of the rights under the Contract, Amendment and Assignment.

37. N&H is entitled to restitution of the consideration given by N&H to acquire the rights under the Contract through the execution of the Amendment.

### FOURTH CAUSE OF ACTION

### CONVERSION

### (Against GREEN VALLEY)

38. N&H reaffirms and re-alleges the above paragraphs as set forth more fully herein below.

39. On or about March 19, 2007, the Plaintiffs in the original case in this action, namely MIMI NGUYEN, JOHN NGUYEN, LOC PHAN, and BICH TONG (the "Third-party Buyer Plaintiffs"), entered into a contract with N&H to purchase a commercial condominium unit on the Property. They deposited $261,860.00 toward the purchase.

40. Prior to the date N&H entered into the Amendment with GREEN VALLEY, the Third-party buyer Plaintiffs approached N&H and requested that their purchase contract be cancelled and that N&H refunded to them their deposit. The parties agreed to the cancellation. The refund amount however, remained an issue.

41. On or about October 27, 2008, N&H and the Third-party Buyer Plaintiffs entered into an agreement to cancel the purchase contract between them. Under the cancellation agreement, N&H was to refund to the Third-party Buyer Plaintiffs the sum of $50,000.00, with the remainder of this deposit to be paid at an undetermined time.

42. A balance of $156,035.83 remains in escrow.

43. N&H has the right to immediate possession of the above-said balance. N&H has instructed the escrow officer to release said amount to the Third-party Buyer Plaintiffs.

44. GREEN VALLEY has substantially interfered with N&H's ownership and possessory interests in and converted the deposit balance ($156,035.83) by instructing escrow not to release to N&H.

CROSS-COMPLAINT BY N&H INVESTMENTS LLC
Case No. 109-CV-165976

Case: 15-05052   Doc# 86-13   Filed: 05/27/15   Entered: 05/27/15 13:04:25   Page 9 of 28
Case: 15-05052   Doc# 86-13   Filed: 05/27/15   Entered: 05/27/15 13:04:25   Page 9 of 28
of 29

45.     As the natural, reasonable, and proximate result of GREEN VALLEY's wrongful conversion on N&H's property, N&H suffered damages in the amount of $156,035.83.

46.     As a further proximate result of GREEN VALLEY's wrongful conversion of N&H's property, N&H has been sued by the Third-Party Buyers, and therefore had incurred costs of defend said action in an amount to be established by proof at trial.

FIFTH CAUSE OF ACTION

INDEMNITY

(Against GREEN VALLEY)

47.     N&H reaffirms and re-alleges the above paragraphs as set forth more fully herein below.

48.     Subsequent to the Assignment, N&H entered into a number on contract to sell individual commercial condominium units to interested third-party purchasers.

49.     Two of those purchasers, WENDY NGUYEN and HUONG HAN (hereinafter "Buyers Nguyen and Han"), entered into a purchase contract with N&H on or about October 17, 2007. They deposited $90,750.00 toward the said purchase.

50.     The above-said deposit was transferred to GREEN VALLEY in accordance with the Amendment agreement.

51.     Buyers Nguyen and Han have instituted action against N&H, Santa Clara County Superior Case No. 110-CV-184398, to recover said deposit.

52.     Pursuant to the terms of the Amendment, GREEN VALLEY was to return deposits to any third-party purchaser in the event said purchaser failed to close escrow or complete the purchase. GREEN VALLEY thus has the contractual obligation to return the deposit to Buyers Nguyen and Han.

53.     GREEN VALLEY has failed or refused to, and continue to fail or refuse to, return the deposit to Buyers Nguyen and Han.

54.     Pursuant to the terms of the Amendment, GREEN VALLEY was to indemnify and hold harmless N&H from and against the lawsuit by Buyers Nguyen and Han.

10

WHEREFORE, N&H demands judgment against defendants, and each of them, as follows:

A.    With regard to the First Cause of Action:

    1.    Compensatory damages in the amount of $1,030,884.90;

    2.    Additional damages to be established by proof at trial;

    3.    Exemplary damages in an amount determined by the court to be reasonable as authorized by section 3924 of the California Civil Code; and

    4.    The reliefs requested in section F below.

B.    With regard to the Second Cause of Action:

    1.    Compensatory damages in the amount of $1,030,884.90;

    2.    Additional damages to be established by proof at trial; and

    3.    The reliefs requested in section F below.

C.    With regard to the Third Cause of Action:

    1.    An order by the court rescinding the three agreements described in this cross-complaint as the Contract, Assignment, and Amendment;

    2.    Restitution damages in the amount of $1,034,884.90; and

    3.    The relief requested in section F below.

D.    With regard to the Fourth Cause of Action:

    1.    Compensatory damages in the amount of $156,035.30;

    2.    Additional damages to be established by proof at trial;

    3.    Exemplary damages in an amount determined by the court to be reasonable as authorized by section 3924 of the California Civil Code; and

    4.    The relief requested in section F below.

E.    With regard to the Fifth Cause of Action:

    1.    Complete indemnification by GREEN VALLEY; and

    2.    The reliefs requested in section F below.

F.    With regard of all causes of action:

CROSS-COMPLAINT BY N&H INVESTMENTS LLC

1      1.   Costs incurred in this action, including attorneys' fees, to the extent
2           permitted by law;
3      2.   Interest on the damages according to law;
4      3.   Prejudgment interest; and
5      4.   Any other and further relief that the court considers proper.
6  Dated: November 11, 2011

7

8                              Dan Do
                               Attorney for Defendant/Cross-defendant/
9                              Cross-complainant N&H Investments LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case: 15-05052   Doc# 8   Filed: 05/27/15   Entered: 05/27/15 15:06   Page 12 of 23
Case: 15-05052   Doc# 16-18   Filed: 05/21/16   Entered: 05/21/16 19:24   Page 13 of 29

# EXHIBIT A



## County of Santa Clara

Environmental Resources Agency
Department of Environmental Health
Hazardous Materials Compliance Division
1555 Berger Drive, Suite 300
San Jose, California 95112-2716
(408) 918-3400 FAX (408) 280-6470
www.EHinfo.org



March 23, 2005

c/o Mr. Victor LoBue
Caldo Oil Company Inc.
20100 Black Road
Los Gatos, CA 95030

Subject:     Fuel Leak at Fuel Leak at Caldo Oil Company Inc., 2266 Senter Rd., San Jose, CA
             - SCVWDID 07S1E22G04f, Case No. 17-081

Dear Mr. LoBue:

This letter transmits the enclosed underground storage tank (UST) case closure letter for the
subject case in accordance with Chapter 6.75 (Section 25296.10 [g]). The State Water Resources
Control Board adopted this letter on February 20, 1997. As of March 1, 1997, all Local Oversight
Programs (LOP) in the State are required to use this case closure letter for UST leak sites. The
Santa Clara Valley Water District began transferring the LOP and all cases to the County of
Santa Clara Department of Environmental Health on July 1, 2004. The County of Santa Clara is
responsible for the issuance of the attached closure letter. The case closure summary is also
enclosed. These documents confirm the completion of the investigation and cleanup of the
reported release at the subject site. The subject fuel leak case is closed.

Please note the following conditions still remain at the site:



Residual contamination both in soil and groundwater remains at the site that could pose an
unacceptable risk under certain site development activities such as site grading, excavation, or
the installation of water wells. The County and the appropriate planning and building
department shall be notified prior to any changes in land use, grading activities, excavation,
and installation of water wells. This notification shall include a statement that residual
contamination exists on the property and list all mitigation actions, if any, necessary to ensure
compliance with this site management requirement. The levels of residual contamination and
any associated site risk are expected to reduce with time.

Board of Supervisors: Donald F. Gage, Blanca Alvarado, Pete McHugh, James T. Beall, Jr., Liz Kniss
County Executive: Peter Kutras, Jr.

c/o Mr. Victor Lobue
Page two

If you have any questions regarding the enclosed case closure form, please call Miguel A. Silva of the Santa Clara Valley Water District at (408) 265-2607, extension 3759. Thank you.

Sincerely,

Ben Gale, Director

Attachments:
1. Case Closure Letter
2. Case Closure Summary

cc/encs:    Ms. Barbara Sieminski, Regional Water Quality Control Board
Mr. Jim Martin, Weiss Associates
Mr. James Crowley, Santa Clara Valley Water District w/o enclosures
Ms. Lily Lee, Division of Clean Water Programs

# EXHIBIT B

<u>REAL PROPERTY PURCHASE AND SALE AGREEMENT</u>

<u>AND JOINT ESCROW INSTRUCTIONS</u>

THIS REAL PROPERTY PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (the "Agreement") is dated as of March 31, 2005, for reference purposes only, and is made and entered into by and between IMPERIAL INVESTMENT & DEVELOPMENT INC., and/or Assignee, where such Assignee shall be an LLC with John Wynn as the managing member ("Buyer") and GREEN VALLEY CORPORATION, a California Corporation ("Seller"), and is directed to STEWART TITLE COMPANY OF CALIFORNIA (the "Title Company" or "Escrow Holder") as instructions to establish an escrow (the "Escrow") to accommodate the transactions contemplated (this "Agreement").

Recitals

A.    Seller has a legal contract to purchase certain real property (the "Property") located in the City of San Jose, County of Santa Clara, State of California, consisting of approximately two and sixty-sixths (2.66) acres, and more particularly described as APN 477-73-039 and APN 477-73-042, as shown on that map attached as <u>Exhibit A</u>.

B.    Prior to commencing construction on the Improvements as described below Seller shall purchase the Property and obtain title to the Property. This approximately 2.66 acre Property shall be referred to as the "Retail Property".

C.    Seller agrees to obtain construction financing to construct a new retail building shell on the Retail Property, consisting of approximately Thirty three thousand eight hundred three (33,803) gross square feet, to include the building shell (the "Building") plus on site Improvements consisting of landscaping, walkways, paving and the like, (collectively the "On-Site Improvements") (hereafter, the Building and the On-Site Improvements may be collectively referred to as the "Improvements") pursuant to the preliminary plans and specifications attached as <u>Exhibit B</u>. It is agreed and understood that Seller may make changes to the Improvements consistent with the completion of the Project contemplated by Exhibit B. Any change to Exhibit B requested by Buyer after execution of this Agreement will be considered by Seller in its sole discretion. Seller's consent to any changes requested by Buyer which are anticipated to increase the cost of construction of the Improvements ("Change Order Costs") shall be conditioned upon Buyer paying the Change Order Costs within 5 days of Seller advising Buyer of Seller's conditional consent and the Change Order Costs.

D.    Seller agrees to provide a tenant improvement allowance to Buyer for the division of the building shell into 20-28 separate units measuring no less.

1

described in paragraph 2.2.1. Tenant Improvements to include roof top heat pump HVAC units with thermostats, unit demising walls, one single occupant restroom per unit, standard 2 ft. by 4 ft. t-bar ceiling grid with ceiling tiles, 2' ft. by 4 ft. fluorescent lighting fixtures with Prismatic lenses installed per City of San Jose Building Code, electrical outlets and switches installed per City of San Jose Building Code (minimum). The Tenant Improvement allowance will not include paint or flooring.

E. Seller to obtain a condominium Plan for the Retail Property and Improvements ("the Project") providing for approximately twenty five 25) to thirty (30) separate units. Seller to prepare CC&R's for the Project, which shall provide that the Project shall be limited to having not more than 2 of each type of, business (except professional offices) and will provide limitations consistent with the deed restrictions that exist on the property. The CC&R's shall be submitted to Buyer in writing prior to recordation, for Buyer's approval, which approval shall not be unreasonably withheld. Should Buyer not advise Seller in writing of its reasonable objections within 10 days of Seller's submission of the proposed CC&R's, they shall be deemed approved by Buyer.

F. Seller desires to sell the Project to Buyer, and Buyer desires to purchase the Project from Seller, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the terms and covenants herein set forth, Buyer and Seller hereby agree as follows:

1. AGREEMENT TO PURCHASE AND SELL. Seller agrees to sell the Project to Buyer, and Buyer hereby agrees to purchase the Project from Seller, on the terms and conditions and subject to the conditions precedent set forth in this Agreement.

2. PURCHASE PRICE AND PAYMENT.

2.1 Purchase Price. The purchase price for the Property and the Improvements (the "Purchase Price") shall be an amount equal to Thirteen Million Five Hundred Twenty One Thousand Thousand Two Hundred Dollars ($13,521,200.00.). Said Purchase Price includes all applicable permits and fees, including, but not limited to plan check and permit fees, construction taxes, public works fees, in-lieu of fees, utility connection charges and fees and school fees.

2.2 Adjustments to Purchase Price. The Purchase Price shall be adjusted by any unpaid Buyer requested change orders (which Buyer is obligated to

2

pay within 5 days of Sellers conditional consent) as set forth in Recital C above. In addition the Purchase price shall be adjusted by a sum equal to the greater of the actual increases in Construction Costs or the application of the CPI to the Construction Costs incurred by Seller from and after the date of this agreement.

2.2.1 **Tenant Improvements.** Seller to provide a Tenant Improvement allowance to Buyer for an additional fee not to exceed Twenty-Five Dollars per square foot or a total Tenant Improvement Allowance of Eight Hundred Forty Five Thousand Seventy-Five Dollars ($845,075.00). Said Tenant Improvement Allowance shall be paid from Buyer to Seller in addition to the Purchase Price listed above. The Tenant Improvements shall include the following:

- Rooftop Heat Pump HVAC Units with Distribution and Thermostat
- Demising Walls (Units to be a minimum of 1,200 square feet)
- One (1) Single Occupant Restroom per Unit
- 2'x4' T-Bar Ceiling (Grid and Tile)
- 2'x4' Flourescent Lighting with Prismatic Lenses within T-Bar Ceiling Grid
- Electric Outlets and Switches per City of San Jose Building Code. Minimum
- No Paint
- No Flooring

2.2.2 **Additional Purchase Price.** If Seller is able to increase the size of the Buildings beyond Thirty-Three Thousand Eight Hundred Three (33,803) square feet then Buyer shall pay to Seller two hundred fifty dollars ($250.00) per additional square foot. For purposes of this Agreement the building square footage is to be determined by calculation, utilizing the plans that are approved by the building department. The basis for the calculation shall be outside face of stud to outside face of stud ("Square Foot").

2.2.3 "CPI" shall mean the Consumer Price Index, All Urban Consumers, Sub-Group "All Items," San Francisco-Oakland Metropolitan Area" United States '(base year 1967=100) now being Published "bi-monthly" by the United States Department of Labor, Bureau of Labor Statistics. If the CPI is changed so that the base year differs from that used as of the Commencement Date, the CPI shall be converted in accordance with the conversion factor published by the U.S. Department of Labor, Bureau of Labor Statistics. If a conversion factor is not available, or if the CPI is

3

otherwise substantially changed or revised or for any reason, there shall be substituted in lieu thereof the most nearly comparable official price index of the United States Government in order to obtain substantially the same result as would be obtained had the original CPI not been substantially changed or discontinued, as the case may be.

2.2.4 "Construction Costs" shall mean: costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance; costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed; rental costs of machinery and equipment exclusive of hand tools, whether rented from an affiliate of Seller or others; costs of premiums for all bonds and insurance permit fees, and sales, use or similar taxes; additional costs of supervision and field office personnel directly attributable to the passage of time; and fees paid to architects, engineers and other professionals.

2.3 <u>Development Costs Distribution:</u> As per this Agreement, it is agreed that Seller is processing the proposed commercial project through the City of San Jose for a General Plan Amendment, Planned Development (PD) Zoning and Permit, and Building Permits to allow for development entitlements. Seller and Buyer agree that through the course of the development process, costs will be incurred to process certain items such as City permits and development plans. Should the proposed project not receive the necessary development entitlements from the City of San Jose, and Seller does not wish to proceed with the purchase of the Property or the development of the project, Buyer and Seller agree to share in the costs incurred during the development entitlement period of the Project. These costs will include, but are not limited to architectural designs, consultant fees, permit fees, reports and studies for the project development, printing, travel, etc. Both Buyer and Seller, upon such time as costs are due, will review invoices and each party will pay 50% of the total amount.

In the event of a cancellation of this Agreement based on the condition that Seller is unable to obtain the necessary development entitlements, and in the event that one party pays the full amount of an incurred cost, or incurs administrative costs per the development of the project, the other party shall be responsible for repayment of their Fifty Percent (50%) portion of the cost. Such costs will be submitted in writing to the second party for reimbursement within thirty (30) days of written invoice.

4

2.4    Deposits.

A.    Initial Deposit.  Upon the mutual execution of this Agreement (the "Effective Date"), Buyer shall deliver to Seller a cash deposit (the "Deposit"), in the sum of Fifty Thousand Dollars ($50,000,) via cashier's check or wire transfer drawn from Buyer's account only.

B.    Comment and Review of Plans: At the completion of each of the following stages of design, Seller shall forward a copy of the drawings to Buyer for review and comment except as provided below.  Buyer shall have a period of 15 days to review and comment on the design.

| Design Stage: | Buyer Review Required: |
|---|---|
| *General Plan Amendment | N/A |
| *PD Zoning | N/A |
| *PD Permit | N/A |
| Tentative Map | Yes |
| Shell Working Drawings | Yes |
| Condominium Plan | Yes |

*Architectural and Engineering Plans for these stages are considered to have been reviewed previously and are attached under Exhibit A.

C.    Additional Deposits To Seller.   Within the sooner of five (5) business days of receipt from the City of San Jose by Seller for a General Plan Amendment, Buyer shall make an additional cash deposit to Seller in the amount of Five Hundred Thousand Dollars ($500,000.00).  Upon receipt by Seller of notice from the City of San Jose that the PD Zoning is approved, Seller shall notify Buyer in writing, and within five (5) business days thereafter Buyer shall deliver to Seller an additional cash deposit in the amount of Five Hundred Thousand Dollars ($500,000.00). Upon receipt of GP Amendment Approval, Seller will move toward the Close of Escrow for the purchase of the Property. Upon receipt by Seller of notice from the City of San Jose that the PD Permit is approved, Seller shall notify Buyer in writing, and within five (5) business days thereafter Buyer shall deliver to Seller an additional cash deposit in the amount of Five Hundred Thousand Dollars ($500,000.). Upon receipt by Seller of notice by the City of San Jose that a Building Permit is ready for pick-up, Seller shall notify Buyer in

5

writing, and within five (5) business days thereafter Buyer shall deliver to Seller an additional cash deposit in the amount of Five Hundred Thousand Dollars ($500,000.) All deposits to be made by Buyer under this Agreement shall be made via cashier's check or wire transfer drawn from Buyer's account only

Summary of Deposits:

| | |
|---|---|
| Initial Deposit: | $ 50,000.00 |
| GP Amendment Approval: | $ 500,000.00 |
| PD Zoning Approval: | $ 500,000.00 |
| PD Permit | $ 500,000.00 |
| Building Permit | $ 500,000.00 |

D.    Application of Deposits. Upon Buyer's delivery of the Deposits to Seller, ("Deposits" refers to both the Initial Deposit and all Additional Deposits) the Deposits shall be deemed non-refundable. Seller shall not be required to keep the Deposits separate from other funds, and, unless otherwise required by law, Buyer shall not be entitled to interest on the Deposits. In no event or circumstance shall Buyer have the right to any use of the Deposits and, specifically, Buyer may not use the Deposits as a credit or to otherwise offset any payments or escrow. The Deposits are to be credited to the Purchase Price at the Close of Escrow. Seller shall retain the Deposit as liquidated damages (pursuant to the provisions of Section 11, below) if this Agreement is subsequently terminated because of Buyer's default, or if the Escrow does not close as and when required for any reason other than Seller's default under this Agreement. Notwithstanding the foregoing, if the Escrow does not close because of Seller's breach of or default under this Agreement, then the Deposits shall be promptly returned to Buyer as Buyers sole and exclusive remedy (pursuant to the provisions of Section 11, below).

E.    If the City of San Jose does not approve Seller's request for a General Plan Amendment and Sellers Rezoning request, or in granting such approval(s) imposes conditions or restrictions which are deemed by Seller in its sole discretion to be too burdensome (unless the full costs of compliance with such conditions and restrictions are paid in advance by Buyer), and Seller notifies Buyer that it does not wish to proceed with the purchase of the Property under the Underlying Purchase Agreement, Buyer shall have an option to request that Seller assign Seller's interest in the

6

Underlying Purchase Agreement on the following terms and conditions: (1) Buyer shall request that Seller make such assignment in writing with a direction that Seller shall retain from the Deposits a sum equal to all costs paid by Seller to the date of the request, including but not limited to but limited to deposits, architectural fees, city permit fees, legal fees, surveys, reports, and consulting fees (should the Deposits be insufficient to cover such costs the request shall be accompanied by the directive and a cashier's check for the balance of such costs); (2) thereafter, and without impact on Buyer's obligation to reimburse Seller's costs under the immediately preceding subsection, Seller shall endeavor to obtain from the party identified as the seller under the Underlying Purchase Agreement a consent to such assignment (if such consent is necessary), and in the absence of such consent (if required) no assignment shall occur; and (3) Buyer executes an indemnity agreement in reasonable form holding Seller and its agents, officers, and employees from any and all losses or damages arising out of the attempted assignment, assignment or ultimate purchase and development of the Property, and to defend Seller in any litigation or proceedings brought by any third party in connection therewith, with counsel of Seller's choice.

3. ESCROW. The purchase and sale described in this Agreement shall be consummated through the Escrow, as provided below.

3.1 Escrow. The Escrow for this transaction shall be at Stewart Title Company of California, 12820 Saratoga-Sunnyvale Road, Saratoga, California 95070
Attention: Debby Magliocco

3.2 Joint Escrow Instructions. This Agreement shall constitute joint escrow instructions to Escrow Holder to consummate the purchase and sale of the Property on the terms and conditions set forth herein; provided, however, that the parties shall execute such additional instructions, as may be required by Escrow Holder from time to time, which are not inconsistent with the provisions of this Agreement.

3.3 Close of Escrow. The closing of the Escrow (the "Close of Escrow") shall be deemed to occur upon recordation in the Recorder's Office of Seller's grant deed conveying fee title to the Property to Buyer (the "Grant Deed"), and shall occur on or before the date which is ten (10) days after Seller's written notice to Buyer of completion of the improvements and Seller's

7

receipt of a Final Inspection from the City of San Jose (the "Closing Date").

3.4 <u>Buyer's Right to Extend Close of Escrow.</u> Buyer shall have the right to extend the close of escrow for up to thirty (30) days, in order for Buyer to secure acceptable financing. Buyer shall pay to Seller, in advance, interest on the outstanding balance of the purchase price at the rate of twelve percent (12%) (the "Purchase Price Interest"). Buyer shall request such extensions in writing, stating the desired extended Closing Date, accompanied by the full amount of the Purchase Price Interest and the basis for its computation. The Purchase Price Interest shall be deemed earned on receipt by Seller and shall be nonrefundable. Under no circumstances shall the Purchase Price Interest be applied to any portion of the Purchase Price. It is expressly agreed that Buyer's ability to secure financing is NOT a contingency to this transaction or Buyer's obligations under this Agreement.

3.5 <u>Delivery of Seller's Documents.</u> On or before the Closing Date, Seller shall deposit with the Escrow Holder all of the following: (i) the fully executed and acknowledged Grant Deed; (ii) escrow instructions sufficient to enable Escrow Holder to close the Escrow in accordance with the terms of this Agreement; (iii) the FIRPTA certificate described in subparagraph 6.1.D hereof; and (iv) any other documents, records or agreements called for or required under this Agreement that have not been previously delivered.

3.6 <u>Delivery of Buyer's Documents and Funds.</u> On or before the Closing Date, Buyer shall deposit with the Escrow Holder all of the following: (i) cash or other immediately available funds in the amount of the Purchase Price, less the Deposits, plus Buyer's share of closing costs; (ii) escrow instructions sufficient to enable Escrow Holder to close the Escrow in accordance with the terms of this Agreement; and (iii) any other documents, records, agreements or funds called for hereunder that have not been previously delivered.

3.7 <u>Proration and Costs.</u> Non-delinquent real property taxes and assessments (based on most recently available figures) shall be prorated as of the Close of Escrow. Buyer shall pay closing costs, Escrow Fee, title insurance, County transfer tax, and City transfer tax. Buyer shall pay all recording charges and fees, all fees and costs related to Buyer's financing in the Property.

4. <u>DELIVERY OF TITLE; TITLE INSURANCE.</u>

8

### 4.1 Delivery of Title.

A. At the Close of Escrow, Seller shall convey fee title to the Property to Buyer by grant deed, on Escrow Holder's standard form, or on a form otherwise reasonably acceptable to Buyer and Seller. At the Close of Escrow, the Title Company shall issue a CLTA owner's policy of title insurance (the "Title Policy") to Buyer in the amount of the Purchase Price, showing title to the Property vested in Buyer subject only to those exceptions (the "Permitted Exceptions") to title set forth in that certain preliminary title report (the "Title Report") issued by the Title Company, bearing order number _____ and dated _____, a copy of which is attached as Exhibit C. Buyer acknowledges receipt of the Title Report and expressly represents that Buyer has read the Title Report and any documents referenced in the Title Report that Buyer feels are necessary to review and that Buyer expressly approves the Permitted Exceptions, including but not limited to, the deed restrictions referenced therein.

B. Notwithstanding the provisions of subparagraph 4.1.A, above, and in addition to the matters referenced in the Title Report, the following shall be deemed to be Permitted Exceptions:

    (1)   the lien of real property taxes and assessments not then delinquent;

    (2)   matters apparent by an inspection of the Property (subject to the provisions of this Agreement with regard to the respective obligations of the parties);

    (3)   Title Company's standard pre-printed exceptions to title;

    (4)   the Final Map, the Development Agreement, the Subdivision Improvement Agreement, the Condominium Plan, and the CC&R's for the Property, and any other standard agreements or conditions which effect all of the other parcels within the Property;

    (5)   all necessary easements effecting the Property relating to utilities, access and any other standard conditions which are required to facilitate construction of the improvements and utilization of the Property;

    (6)   all matters affecting the condition of title to the Property created by or with the consent of Buyer, which consent

9

shall not be unreasonably withheld or delayed, including, but not limited to the utility easements described above;

(7) all leases and any written agreements related to the use of the Property or any portion thereof previously provided to Buyer as listed on Exhibit "D."

5. <u>SELLER'S CONDITIONS TO CLOSE.</u>

5.1 <u>Conditions.</u> Seller's obligation hereunder to complete the sale of the Project is subject to satisfaction of each of the following conditions at or prior to the Closing Date, each of which is for the sole benefit of Seller, unless waived by Seller in writing.

A. <u>Obligations.</u> Buyer shall have timely performed each and every one of Buyer's obligations set forth in this Agreement. Time is of the essence under this Agreement and the failure of Buyer to timely perform each and every obligation set forth in this Agreement shall be a material breach of the terms of this Agreement.

B. <u>Accuracy of Buyer's warranties and Representations.</u> All of the representations and warranties of Buyer contained herein shall be true and accurate at all times from the Effective Date through the Close of Escrow.

C. <u>Seller's Title.</u> Seller having obtained clear marketable title to the Property. Should Seller fail to acquire title to the Property as set forth in Recital A above, for whatever reason, Seller shall be released from any obligation to complete the sale contemplated under this agreement.

D. <u>Financing.</u> Seller shall obtain construction financing for the Project under terms and conditions satisfactory to Seller in its sole discretion. Should Seller be unable to obtain suitable construction financing, then Seller and Buyer shall be released from this Agreement.

D. <u>Receipt of Building Permit.</u> Seller shall obtain all entitlements and permits from the City of San Jose, prior to commencement of construction. Should Seller be unable to obtain the required permits and entitlements (with project design to reasonable

1.0

satisfaction of Buyer and Seller), through no fault of Seller then Seller and Buyer shall be released from this Agreement. [Notwithstanding the limitations on liability set forth in Section 11 Buyer agrees to reimburse Seller for one-half of the expenses paid by or incurred by Seller in the permits and entitlement process in an amount not to exceed $150,000.00. Upon determining that Seller is unable to obtain required permits and entitlements any remaining balance of Deposits (after deducting any and all unpaid obligations of Buyer under this Agreement) shall be returned to Buyer upon Buyer's execution of a release of liability under this Agreement for the benefit of Seller.]

E.  **Receipt of Purchase Price.**  Seller shall have received, or Escrow Holder shall have received and be prepared unconditionally to pay Seller, upon the Close of Escrow, the Purchase Price for the Project, including all title and escrow costs and other prorations described herein.

F.  **Close of Escrow.**  The Close of Escrow shall occur no later than the Closing Date.

5.2  **Termination of Escrow by Seller.**  If any of the conditions set forth in subparagraphs 5.1.A through 5.1.D above have not been satisfied, or waived by Seller, as and when required, then this Agreement and Escrow shall terminate upon written notice by Seller to Buyer, all documents deposited into Escrow shall be returned to the party who deposited the same without further instructions by either party to Escrow Holder, and the Deposits shall be paid to Seller or returned to Buyer, as the case may be, as provided in subparagraph 2.4.D hereof.

6.  **BUYER'S CONDITIONS TO CLOSE.**

6.1  Buyer's obligation hereunder to complete the purchase of the Project is subject to satisfaction of each of the following conditions at or prior to the Closing Date, each of which is for the sole benefit of Buyer, unless waived by Buyer in writing.

A.  **Seller's Completion of Building Improvements.**  Seller shall have completed construction of the Building and the improvements as provided for in the final working drawings and substantially in conformance with the Plans attached as Exhibit B, and delivered to Buyer a Building Department Final Inspection approved by the City of San Jose.

11

B. Seller shall have executed, acknowledged, and delivered the Grant Deed into Escrow, for recording and subsequent delivery to Buyer.

C. FIRPTA Certificate. Seller shall have executed and delivered to Escrow Holder a certificate satisfying the requirements of Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA" Certificate").

D. Title Policy. The Title Company shall be ready, willing and able to issue the Title Policy.

E. Accuracy of Seller's Warranties and Representations. All of the warranties and representations of Seller set forth in this Agreement shall be true and correct at all times from the Effective Date through the Close of Escrow.

6.2 Termination of Escrow. If any of the conditions set forth in subparagraphs 6.1.A through 6.1.E are not satisfied, or waived by Buyer, as and when required, then this Agreement and the Escrow shall terminate upon written notice by Buyer to Seller, all documents deposited into Escrow shall be returned to the party who deposited same without further instructions by either party to Escrow Holder and the Deposits shall be paid to Seller or returned to Buyer, as the case may be, as provided in subparagraph 2.3.D hereof.

7. BUYER'S PURCHASE OF PROPERTY "AS IS". BUYER, BY ITS EXECUTION OF THIS AGREEMENT, ACKNOWLEDGES THAT (I) BUYER HAS CONDUCTED STUDIES AND INVESTIGATIONS OF THE PROPERTY AND THE PROJECT AS FULLY AS BUYER MAY DESIRE; (II) THE PROJECT IS TO BE PURCHASED BY BUYER IN ITS CONDITION AS OF THE CLOSING DATE, "AS IS", WITHOUT ANY IMPLIED OR EXPRESS WARRANTY OR REPRESENTATION WHATSOEVER BY SELLER, EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT AND ALL EXPRESS CONTRACTORS' WARRANTIES FOR WORKMANSHIP AND EQUIPMENT WARRANTIES; AND (III) THE CLOSE OF ESCROW HEREUNDER WILL BE DEEMED ACCEPTANCE BY BUYER OF THE PROJECT AS CONSTRUCTED,. BUYER ACKNOWLEDGES AND AGREES THAT NEITHER SELLER NOR ANY OF SELLER'S EMPLOYEES, AGENTS OR REPRESENTATIVES HAS MADE ANY WARRANTIES, REPRESENTATIONS OR AGREEMENTS BY OR ON BEHALF OF SELLER NOT EXPRESSLY SET FORTH IN THIS AGREEMENT AS TO ANY MATTERS CONCERNING THE PROPERTY OR THE IMPROVEMENTS, THE PRESENT USE OR CONDITION OF THE PROPERTY, OR THE SUITABILITY OF THE PROPERTY AND/OR THE IMPROVEMENTS FOR BUYER'S INTENDED USE THEREOF. BY INITIALING THIS PROVISION AS

12